UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 4:18-cr-40015-TSH |
| DANIEL DONALD | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

_____

HILLMAN, D.J.


**FINDINGS AND ORDERS ON DEFENDANT'S MOTIONS TO SUPPRESS**

May 23, 2019

**Introduction**

The Defendant, Daniel Donald is charged with various drug and firearm offenses.  He has

moved to suppress from the introduction into evidence against him at trial, the results of

installation of a GPS tracking device (Document 113), any and all evidence seized pursuant to a

search warrant (Document 115), and certain statements that he made to law enforcement officials

while in custody (Document 117).  For the reasons set forth below those motions are denied.

**Background** .

On May 19, 2017,  Drug Enforcement Administration Special Agent David DiTullio applied

for and received a warrant authorizing the installation of a GPS tracking device on a 2004 Jeep

Grand Cherokee, registered to Robert Young of 13 Groton Place, Worcester, Massachusetts, and

a 2012 Cadillac Escalade registered to the Defendant Donald, at 16B Shrewsbury Green Drive, Shrewsbury, Massachusetts.

In his affidavit in support of that application Agent DiTullio informed that in October of 2016, the management company of an apartment complex in Westborough had expressed "concerns" to the Westborough Police about the occupants of an apartment in the complex in October of 2016. Specifically, that Neckia Madden was the lessee of the apartment but that Young and Donald appeared to be living there.[1] That same month, during a maintenance visit to the apartment, an employee of the management company observed a moneycounter in the apartment, which was reported to the authorities. The affidavit also related that Madden was an exotic dancer at an adult entertainment business.[2]

A criminal record check revealed that the Defendant had at least eight prior drug convictions in state court and had served time in state prison for possession with intent to distribute heroin, cocaine, and oxycodone. At the time of the investigation the Defendant was on probation for assault and battery. Robert Young had four prior state court drug convictions, and Neckia Madden was defending charges in the Westborough District Court for possession with intent to distribute a Class B substance at the time the affidavit was executed. The affidavit also related that in March of 2017, a high capacity Glock magazine with one round was found outside the entrance to the building. That building contains 63 apartments.

On May 2, 2017, a surveillance team followed the Defendant, Young, and Ms. Madden from the PARC Apartment Complex to Newton. The three travelled in the Cadillac Escalade and the Jeep Cherokee to a commercial automotive garage in Newton where they exhibited behavior that

---

[1] There is no further discussion in the affidavit about why the management company was "concerned" about their presence in the apartment or why they notified the police instead of using civil process to redress any issues.
[2] It would not be unusual for exotic dancers to have a money counting machine because they rely upon tips from customers, or so I am told.

was consistent with drug dealing and which included establishing counter surveillance. Agent DiTullio opined in his affidavit that they traveled to Newton to purchase drugs and that Young acted as a lookout. He also related that the premises was identified in 2013 as the site of several meetings between the co-conspirators of "a major drug trafficking conspiracy."

On May 9, 2017, the agents observed the Defendant, Young, and an unidentified female travel in a white Cadillac (not one of the subject vehicles) to 13 Groton Place, in Worcester. Shortly after they arrived the police observed activity that was consistent with street drug sales; at different times, two vehicles arrived, the drivers entered 13 Groton Place, exited within two minutes, then left the area.

On November 30, 2017, Agent DiTullio applied for, and received, a warrant to search the apartment at 13 Groton Place, in Worcester, Massachusetts. Groton Place is a stand-alone building at the rear of a multi-family unit. The initial search did not reveal any drugs inside the apartment. However, after the initial search was complete, Worcester Police Officer Gaffney who was stationed outside of the apartment noticed that the vinyl siding to the apartment had a bump to it. That bump was a "hide" between the interior and exterior walls of the apartment. Inside of the hide the agents located a kilogram of cocaine, 400 grams of heroin, 88 grams of cocaine base, dozens of fentanyl pills, and a Smith and Wesson 9 mm pistol.

At the time of the execution of the search warrant at the 13 Groton Place, the Defendant Donald was on the premises and was arrested. He was advised of his Miranda Rights orally and through the use of a written form which he signed acknowledging that he received and understood those rights. The Defendant invoked his privilege against self-incrimination and chose not to speak to the officers at that time. The Defendant's arrest and Miranda warnings

proceeded the discovery of the hide and the Defendant was aware that the contraband was found in the hide when he was transported to the Worcester Police Department for processing.

At the station the following exchange took place in an interview room:

[1:16]  Morris: I'm just gonna remind you that at the house I Mirandized you, read you
your rights, you understood those right . . .

Donald: Yep.
Morris:  . . . you signed the form saying you understood them.  Um, everything's
Still the same and, um, you know if you wish to talk with us, if you want to stop
at any time that's your right to do so.

[2:38]  DiTullio:  You know what we got out of the side of the house, you know exactly
what was there, right?
Donald:  None of this can be used against me can it?
DiTullio:  We have the stuff so it's, so, it is what it is . . .
Donald:  I understand so that's just, yes let's just . . . yes ok yes sure I assumed,
Just ok so go ahead, so you got what you got and what can I do to help myself out
is what I want to get to.

[3:46]  Donald:  I understand that, you know, but I'm trying to do what I can to get
myself out of a bad situation.  I know that I can guarantee to you guys but on
your end, you can't guarantee much of anything outside of the fact that you know,
"you help us out, we'll do what we can."  I don't want to put myself under the
fucking gun giving statements, you know, of what was there, so on and so forth,
and it get held against me in the court of law as evidence.  You know what I'm
saying?  I know what you guys got but you have to prove that it's mine.  And
we're not going to do that, okay, I'm just simply saying I know what the fuck was
there and I wanna do what I can to help myself out and I know what I can do for
you guys you know what I'm saying but unfortunately for me you guys don't
know what you can do for me. . . yeah I understand I'm looking at a whatever
27 year bit but that doesn't necessarily mean I want to do a 10 year bit either.

[4:48]  Donald:  Hypothetically speaking, hypothetically speaking, let's say there was
A kilo of coke, a little over 300 grams of dopy and a little over 200 pills and
whatever, hypothetically . . . and a gun, hypothetically.

**Discussion**

The GPS Devices

The Defendant argues that no probable cause existed for the issuance of warrant for the installation of the GPS device.  He points to paragraph 45 of the DiTullio affidavit in which the affiant asserts:

> "based on may training and experience, I believe, Young, Donald, and Madden utilized (the Jeep) and (the Escalade) to travel to Newton Automotive on May 2, 2017 in order to obtain a supply of narcotics.  Based on my training and experience I believe that Donald and Madden obtained the narcotics from the business and put the narcotics into the (the Escalade), while Young performed counter surveillance, Madden then transported the narcotics into (the Escalade) back to the Westborough area"

Donald further argues that there was no evidence in the affidavit that a crime was committed on May 9, based upon DiTullio assertion in the affidavit that in paragraph 33 of the affidavit:

> "that in my training and experience, the activity that agents observed at 13 Groton Place on May 9, 2017-i.e. brief visits by multiple individuals over a short period of time-is consistent with drug and drug sales."

The only mention of the Cadillac Escalade being used in any alleged nefarious activity is during the events of May 2, 2017.  The Government urges the court to consider  the affidavit in its totality which, when so read,  more than establishes probable cause;  that there is the probability of criminal activity, not a prima facie showing,  *Spinelli v. United States,* 393 U.S. 410, 419 (1969),  and that the issuing magistrate is entitled to draw his own reasonable inferences from the facts contained within the affidavit.  *United States v. Jackstadt,* 617 F.2nd 12, 14, (2nd Cir. 1980).

The affidavit relates that the Defendant, who has an extensive criminal record of drug convictions in the company of another convicted drug dealer, and an individual with open drug charges drove two vehicles to Newton Automotive which had  been involved in "a major drug trafficking conspiracy."  Specifically, that Newton Automotive had been described in 2013 by another judge of this court with being the scene of a "major drug conspiracy."  What the affiant did not include was that the drug activity which was the source of that comment had occurred in

2010 which was seven years before the events before this court. That being said, their conduct was consistent a drug sale and attempts to secure the scene through the use of counter-surveillance. Probable cause to issue a warrant exists when an affidavit sets forth sufficient facts to justify a prudent person in the belief that contraband will be found in a particular place. *Illinois v. Gates* 462 U.S. 213, 238 (1983), and whether probable cause has been established involves practical common-sense evaluation of the totality of the circumstances. Gates, 462 U.S. @238. All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the location to be searched." *United States v. Ventresca* 380 U.S. 102 (1965). While I believe that the inclusion in the affidavit of the ammunition magazine, and the money counting machine is gratuitous, when you strip away the excess baggage, we are still confronted with individuals with significant criminal records acting in a manner consistent with drug dealing on two occasions within a week period. I do find that there was probable cause for the issuing magistrate judge.

However, even if probable cause for issuing a warrant did not exist, courts will not suppress the evidence obtained where it was objectively reasonable for the officer executing the warrant to have relied in good faith on the issuing judge's determination that probable cause existed. *United States v. Coombs*, 857 F.3rd, 439, 446 (1st Cir. 2017) and while the Defendant makes a spirited argument that the DiTullio affidavit is bare-bones I cannot so agree. While it may contain references to matters that should not have been included, it does not take away from the fact that the totality of the circumstances provided an independent basis to believe that tracking the Cadillac Escalade would reveal the fruits of criminal activity.

The Search of 13 Groton Place

   The Fourth Amendment protects not only the home, but the area "immediately surrounding and associated with the home." *Florida v. Jardines*, 569 U.S. 1, 6 (2013).   The Defendant argues that the hide was not within the residence, but was instead within the curtilage of the property thus requiring a separate warrant.  I find that the hide was within the residence for which the warrant authorized the search.  The fact that one needed to exit the residence to access the hide does not change the fact that the hide was located within the four walls of the residence. "Affidavit for search warrants must be tested and interpreted in a common sense and realistic fashion" *United States v. Ventresca* 380 U.S. 102 (1965), and a "hyper-technical reading should be avoided." *United States v. Bonner* 808 F.2nd 864, 868 (1ˢᵗ Cir. 1986).  The warrant authorized the search of the house, which includes anything within the four walls.

   Further, I do not agree that the "exterior breezeway" constitutes curtilage of the detached apartment.  *Katz v. United States* 389 U.S. 347 (1967).   The Government argues that it is more accurately a walkway to the primary four unit building at the same address, is accessible by the tenants from the four-unit building, and  should be considered as a common area.  A tenant of an apartment building "lacks a reasonable expectation of privacy in the common areas of that building." *United States v. Hawkins*, 139 F3rd 29, 32 1ˢᵗ Cir. (1998).  Here there are five separate living units on the property at 13 Groton Place, and there is no evidence that the Defendant had any right to exclude the other tenants of 13 Groton Place from accessing the walkway and there were no fences or obstructions between the building and the walkway. Accordingly, I cannot find that there was a reasonable expectation of privacy in the area, thus do not find that it is curtilage entitling the Defendant to constitutional protection.

Motion to Suppress the Defendant's Statements

The Defendant claims that the questioning in the Worcester Police Department was improper because he was not given his Miranda warnings, or asked if he was willing to waive those rights prior to answering questions.   He points to what he considers to be the following exchange:

> DiTullio: "you know what we got out the side of the house . . . you know exactly what was there right?"
>
> Donald: "none of this can be used against me can it?"
>
> TFO Morris: "No."
>
> Donald: "I don't wanna give statements . . . then it gets used against me as evidence in court".

Particularly the Defendant points to Task Force Officer Morris' purported answer of "No" to Donald's question that "none of this can be used against me, can it?"  I watched and listened to the recording before the hearing, in Court at the hearing, and again before issuing this opinion.  I do not agree that Task Force Officer Morris said "No," after the Defendant asked his question.  If there was a response, which I could not hear,  it was unintelligible.

The United States argues that the Defendant voluntarily, knowingly, and intelligently waived his Miranda Rights.  There is no argument that Donald was properly advised of his Miranda Rights upon his arrest at 13 Groton Place before the hide was found.  Those rights were administered both orally and in writing and the Defendant signed that he had received those rights.   It is clear on the video  that the agents reminded the Defendant that they had Mirandized him and "you understood those rights."  Donald answered "yep."  A Miranda Rights waiver has no prescribed form.  *United States v. Mejia*, 600 F3rd 12, 17, 18 (1st Cir. 2010.  The video/audio tape clearly reflects a free-flowing exchange initiated by the Defendant with the agents.  Here, there is there is no evidence that the police used tactics that were coercive or overbearing the will

of the accused.  *United States v. Jacques* 744, F3rd 804, 812 (1st Cir. 2014).  The Defendant's lengthy criminal record reflects that his interaction with the justice system were frequent and that he had a general understanding of his Miranda Rights based upon those interactions. Accordingly, for the reasons set forth above, the Defendants Motions are denied.

/s/Timothy S. Hillman
TIMOTHY S. HILLMAN
DISTRICT JUDGE
